TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-98-00209-CV







The Low-Income Women of Texas, as Represented by Robert Prince, M.D.; Curtis Boyd,
M.D.; William Watkins West, Jr., M.D.; The Fairmount Center; The Routh Street
Women's Clinic; and Reproductive Health Services, Appellants


v.


Eric M. Bost, Commissioner of Human Services, in his Official Capacity and his Successors;

The Texas Board of Human Services; The Texas Department of Human Services;

Charles E. Bell, Commissioner of Health, in his Official Capacity and his

Successors; The Texas Board of Health; and The Texas

Department of Health, Appellees





FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. 93-02823, HONORABLE PAUL DAVIS, JUDGE PRESIDING





 The Low-Income Women of Texas(1) filed a lawsuit (2) against the State to challenge
funding restrictions placed on abortion services provided by the State's medical programs for low-income Texans. The restrictions prohibit state funding for abortions except in cases of rape or
incest or when necessary to save the life of the mother; funding for essentially all other necessary
medical procedures is available if the procedure is "medically necessary." Low-Income Women
seek a declaratory judgment that the challenged provisions restricting state funding of medically
necessary abortions violate the Texas Constitution. They also request injunctive relief enjoining
enforcement of the challenged provisions, as well as costs and attorneys' fees. Competing motions
for summary judgment were filed; the trial court granted the State's motion and denied Low-Income Women's motion. Low-Income Women appeal, claiming that the abortion-funding
restrictions violate three provisions of the Texas Constitution: (1) the equal protection clause;
(2) privacy guarantees; and (3) the Equal Rights Amendment (ERA). We will vacate the judgment
and dismiss any claim concerning the currently unfunded Maternal and Infant Health Improvement
Act (Maternal/Infant Health Act). Because we agree that the Medicaid funding restrictions violate
the ERA, we will reverse the judgment of the trial court and render judgment granting Low-Income Women's motion for summary judgment. We will remand the cause to the trial court
solely for consideration of the Low-Income Women's request for costs and attorneys' fees.


FACTUAL AND PROCEDURAL BACKGROUND


Statutory Framework

 The lawsuit filed by Low-Income Women challenges funding restrictions on two
Texas programs that subsidize health services for the poor. At issue are the Texas Medical
Assistance Program, which is Texas's Medicaid program, and the programs created by the
Maternal/Infant Health Act.

 The federal Medicaid program was established in 1965 when Congress enacted Title
XIX of the Social Security Act. 42 U.S.C.A. §§ 1396-1396v (West 1992 & Supp. 2000). 
Medicaid is a joint federal-state indigent-assistance program that provides federal funds to each
state to furnish medical assistance to certain categories of needy persons. Id. § 1396 (West 1992). 
The federal government pays a percentage of the total cost that a participating state incurs in
providing these services. Id. § 1396b (West Supp. 2000). Federal law establishes mandatory and
optional categories of services a participating state may provide under Medicaid. Id. §§ 1396a,
1396d(a) (West Supp. 2000).

 Congress has restricted federal matching funds available for abortions by the annual
enactment of the Hyde Amendment. Named for its sponsor, Representative Henry Hyde of
Illinois, the Hyde Amendment is a rider to the Labor-HEW Appropriations Act that has been
passed every year since 1976.(3) The specific terms of the amendment have varied over the years,
but the versions presently in place and in place when this lawsuit was filed prohibit federal
reimbursement for abortion services except in cases of rape or incest or where the pregnancy
threatens the mother's life.(4) Though the Hyde Amendment prevents states from receiving federal
matching funds for most abortion services, states are free to subsidize at their own expense
abortions for which federal reimbursement is not available. Harris v. McRae, 448 U.S. 297, 311
n.16 (1980); Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999,
Pub. Law 105-277, sec. 509(b), 112 Stat. 2681-385 ("Nothing in the preceding section shall be
construed as prohibiting the expenditure by a State . . . of State . . . funds (other than a State's 
. . . contribution of Medicaid matching funds).").

 Texas has participated in Medicaid almost since the program's inception, passing
enabling legislation in 1967 establishing the Medical Assistance Program. See Medical Assistance
Act of 1967, 60th Leg., R.S., ch. 151, §§ 1-24, 1967 Gen. Laws 310 (Tex. Rev. Civ. Stat. Ann.
arts. 695j, 695j-1, since repealed and codified at Tex. Hum. Res. Code Ann. §§ 32.001-.052
(West 1999 & Supp. 2000)). The program covers all "health care and related services and benefits
authorized or provided under federal law for needy individuals of this state." Tex. Hum. Res.
Code Ann. § 32.003 (West Supp. 2000). Services are limited, however, to those for which the
State can receive federal matching funds. See id. § 32.024(e) (West Supp. 2000). The Texas
Medical Assistance Program therefore tacitly adopts the limits set forth by the Hyde Amendment,
and physicians are reimbursed with Medicaid funds only for abortions necessary to save the
woman's life or when the pregnancy has resulted from rape or incest. By the State's own
admission, every other reproductive health service provided by a doctor with the Texas Medical
Assistance Program is reimbursed if it is medically necessary; with one minor exception, abortion
is the only service of any kind covered by the program that requires a showing of something more
than mere medical necessity.(5)

 In addition to their Medicaid challenge, Low-Income Women have challenged the
abortion funding restrictions found in the Maternal/Infant Health Act. See Tex. Health & Safety
Code Ann. §§ 32.001-.045 (West 1992 & Supp. 2000). This program was created in 1985 to
provide medical and educational services to low-income women and infants. See Maternal and
Infant Health Improvement Act, 69th Leg., R.S., ch. 592, 1985 Tex. Gen. Laws 2224 (Tex. Rev.
Civ. Stat. Ann. art. 4447y, since repealed and codified at Tex. Health & Safety Code Ann.
§§ 32.001-.045). Under the Maternal/Infant Health Act, no funds may be used to provide abortion
services unless the woman's life is in danger. Tex. Health & Safety Code Ann. § 32.005 (West
1992). With no exception for women who are victims of rape or incest, abortion coverage under
the Maternal/Infant Health Act is even more restricted than under the Texas Medical Assistance
Program.


The Parties

 Low-Income Women are represented in this action by physicians and health clinics
that provide abortion services. Doctors Robert Price and Curtis Boyd are both Texas-licensed
physicians who divide their time between their private practices and the Fairmount Center, a
Dallas health center that provides low-cost, outpatient abortions to Medicaid-eligible women. The
physicians and the clinic each assert their own interests and those of their patients, claiming that
because of the funding restrictions on medically necessary abortions, many women are forced to
delay obtaining an abortion until their second trimester, when the procedure poses greater health
risks, because of the time required to find money to pay for a non-subsidized abortion.

 Doctor William Watkins West is also a Texas physician who specializes in
abortions. He provides services at the Routh Street Women's Clinic in Dallas, also a plaintiff-appellant in this case. Between five and ten percent of Dr. West's Routh Street patients are
Medicaid-eligible, and the clinic offers reduced-fee abortions to those women. Finally,
Reproductive Health Services is a non-profit clinic located in Austin that provides abortions,
family planning, prenatal care, and other gynecological services. It provides abortions to
Medicaid-eligible women. Like the other plaintiffs in this lawsuit, Reproductive Health Services
claims that the clinic and the patients it treats are irreparably harmed by the abortion-funding
restrictions.

 The defendants/appellees in this action are Commissioner of Health Charles E. Bell,
the Texas Department of Health, and the Texas Board of Health. While the Human Services
Department is designated by statute as the administrator of the Medical Assistance Program, the
legislature has also provided that the program may be administered in cooperation with other state
agencies. Tex. Hum. Res. Code Ann. §§ 32.003, .021, .023 (West 1990 & Supp. 2000). By
Rule 11 agreement eliminating as defendants the Human Services Department, Board, and
Commissioner, the parties apparently agree that it is the Department of Health that oversees the
Medical Assistance Program and that the Department of Human Services is not involved in the
administration of the program. See Tex. R. Civ. P. 11.


Medically Necessary Abortions

 At issue in this case are abortions that fall in the zone between purely elective
abortions and those sought because the pregnancy resulted from rape or incest or jeopardizes the
mother's life.(6) Low-Income Women do not argue that low-income Texans have a right to funding
for all abortions. Instead, they urge that the same standard of medical necessity that applies to all
other reproductive health care treatments should apply to abortion services as well.

 While abortions are funded when a physician determines that the mother's life is
threatened by the pregnancy, they are unfunded in other cases, absent rape or incest, in which the
physician deems an abortion medically necessary and advisable because of health problems faced
by the mother or the fetus. Even a normal pregnancy strains a woman's health, and some
conditions increase the risk pregnancy poses to a woman's health so greatly that her doctor may
recommend abortion. Low-Income Women detail numerous medical conditions that are caused
or exacerbated by pregnancy. The record contains summary judgment evidence that preeclampsia,
eclampsia, hypertension, diabetes, congenital heart disease, renal failure, sickle cell anemia,
asthma, epilepsy, and cancer are all conditions that may be aggravated or caused by pregnancy and
can threaten the mother's health, even in situations where they do not immediately jeopardize her
life. Thus, a pregnancy carried to term may aggravate pre-existing medical conditions or render
them untreatable without immediately endangering the life of the mother.

 Women who suffer from these conditions face increased health risks. A pregnant
woman experiencing hypertension is at a higher risk for strokes or bleeding disorders. Severe,
pregnancy-induced forms of hypertension can cause seizures, abdominal pain, and nausea, and
may also increase the maternal mortality rate. Pregnant women with diabetes are at a higher risk
of developing hypertensive disease and have higher rates of complications and pregnancy-related
deaths. Epileptic women experience more frequent seizures and are at a high risk of birthing
infants with genetic defects.

 Pregnancy can also aggravate pre-existing mental illness, leading doctors to
recommend abortion for some women who suffer from such conditions. Nonetheless, the State
will not fund those abortions even though pregnancy increases the risk of mental breakdown. 
Also, many psychotropic medications used to treat mental illness pose risks to a fetus, so that a
woman who is unable to afford an abortion may be forced to choose between her own mental
health and the physical well-being of her fetus. In addition, an unwanted pregnancy can cause an
otherwise healthy woman to experience depression, anxiety, and self-destructive behavior, as well
as other forms of mental disturbance.

 Although physicians may recommend abortion in order to protect the mother's
health in any of the above-listed situations, the application of the Hyde Amendment in Texas
prevents expenditure of state money on those abortions unless the mother's life is immediately
threatened by continuing the pregnancy or unless she was the victim of rape or incest. For
virtually any other health treatment, a physician's determination of medical necessity suffices for
reimbursement through the Medical Assistance Program. Only when the recommended treatment
is abortion is the patient required to demonstrate something more than medical necessity.


DISCUSSION


 Low-Income Women and the State each submitted motions for summary judgment,
stipulating that there are no material fact issues in dispute. The trial court granted the State's
motion. When both sides move for summary judgment and the trial court grants one motion and
denies the other, we review the summary judgment evidence presented by both sides and
determine all questions presented. Commissioners Court v. Agan, 940 S.W.2d 77, 81 (Tex.
1997). If we find error, we then render the judgment that the trial court should have rendered. 
Id.

 As a preliminary matter, the State argues that the claims against the Maternal/Infant
Health Act are not ripe because the program is now defunct. Uncontroverted summary judgment
evidence was presented that the program has been unfunded and inactive since 1991, and there is
no indication that the legislature ever intends to revive it. Low-Income Women counter that the
State could revive the program at any time, and the funding restrictions would again violate the
Texas constitution. "At the time a lawsuit is filed, ripeness asks whether the facts have developed
sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or
remote." Patterson v. Planned Parenthood, 971 S.W.2d 439, 442 (Tex. 1998). In the present
case, Low-Income Women premise their claims against the Maternal/Infant Health Act on the
possibility that the legislature will opt to renew funding for this program at some point in the
future. With no ripe claim before us, any opinion we might render regarding the Maternal/Infant
Health Act abortion funding at this time would be merely advisory. We agree with the State that
these claims are not ripe, and we therefore dismiss them. Our opinion will consider only the
claims leveled against the restrictions placed on the State's Medicaid-funded health services.

 At the outset, it is important to establish the parameters of this case. Despite the
volatile public debate aroused by the subject matter before us, this appeal is not about a woman's
right to have an abortion. Low-Income Women do not claim that they have a right to state funding
for all abortions. Rather, they claim that by withholding funding for medically necessary abortions
while funding every other medically necessary reproductive health service for both sexes, the State
impermissibly weighs in on a woman's exercise of choice, discriminating against her in the
process. As another court has noted, if the legislature had made the opposite policy choice and
funded all abortions but refused to fund medical care for poor women who chose childbirth, the
same concerns about discriminatory government treatment would arise. Women of Minn. v.
Gomez, 542 N.W.2d 17, 19 (Minn. 1995). Thus, the present case involves only the narrow issue
of funding medically necessary abortions and should not be construed as an overarching comment
on the morality of abortion or the existence of a woman's right to choose abortion.

 To prevail in this appeal, Low-Income Women must establish in this context that
the Texas constitution offers greater protection of individual rights than does its federal
counterpart, for it has already been determined that the relief sought by Low-Income Women is
not available under the United States Constitution. A challenge similar to the one raised by Low-Income Women was brought under the federal constitution, and the United States Supreme Court
held that Congress's refusal to fund medically necessary abortions did not violate the liberty
interests recognized by Roe v. Wade(7) and its progeny, nor did it violate the First Amendment
establishment clause or the Fifth Amendment equal protection clause. See Harris, 448 U.S. at
318, 326. Since that Supreme Court decision, opponents of the Hyde Amendment have challenged
abortion-funding restrictions under state constitutions. The majority of states that have examined
similar Medicaid funding restrictions have determined that their state statutes or constitutions offer
broader protection of individual rights than does the United States Constitution and have found that
medically necessary abortions should be funded if the state also funds medically necessary
expenses related to childbirth.(8)

 Turning to the challenge brought under the Texas Constitution, Low-Income
Women claim that by funding abortion only in the most limited of circumstances, while funding
all other childbirth-related services under a less restrictive standard, the State impermissibly
interferes with a woman's right to choose whether to have an abortion, thereby violating the right
to privacy and the equal protection guarantees of the Texas Constitution, as well as the Equal
Rights Amendment. See Tex. Const. art. I, §§ 3 (equal protection), 3a (ERA); Texas State
Employees Union v. Texas Dep't of Mental Health & Mental Retardation, 746 S.W.2d 203, 205
(Tex. 1987) (recognizing that while the Texas Constitution contains no express guarantee of a right
to privacy, several provisions in the Bill of Rights combine to implicitly create protected "zones
of privacy").

 Given the occasional inclination of our courts to construe the Texas Constitution
more broadly than its federal counterpart, there is possible merit to the argument that the equal
protection and privacy guarantees found in the Texas Constitution are stronger than those
contained in the federal constitution. See LeCroy v. Hanlon, 713 S.W.2d 335, 338 (Tex. 1986)
("The federal constitution sets the floor for individual rights; state constitutions establish the
ceiling."); State v. Morales, 826 S.W.2d 201, 204 (Tex. App.--Austin 1992) ("[T]he Texas
Constitution accords individuals greater safeguards to their personal freedom than its federal
counterpart does."), rev'd on other grounds, 869 S.W.2d 941 (Tex. 1994). We do not need to
consider these questions, however, because the ERA provides a sufficient basis for resolving this
dispute.


Equal Rights Amendment

 The Texas ERA states: "Equality under the law shall not be denied or abridged
because of sex, race, color, creed or national origin." Tex. Const. art. I, § 3A. The ERA was
overwhelmingly passed by Texas voters, who adopted the amendment by a four-to-one margin on
November 7, 1972. See William Wayne Kilgarlin and Banks Tarver, The Equal Rights
Amendment: Governmental Action and Individual Liberty, 68 Tex. L. Rev. 1545 (1990). Because
both the United States Constitution and the Texas Constitution had due process and equal
protection guarantees before the Texas ERA was adopted, the supreme court has held that the ERA
is "more extensive and provides more specific protection" than those provisions. In re McLean,
725 S.W.2d 696, 697-98 (Tex. 1987). To construe it otherwise would render the ERA redundant
of those pre-existing guarantees and make it meaningless. Id.

 The ERA elevates sex--along with race, color, creed, and national origin--to a
suspect classification, and any law that classifies persons for different treatment on the basis of sex
is subject to strict judicial scrutiny. Id. at 698; Mercer v. Board of Trustees, 538 S.W.2d 201, 206
(Tex. Civ. App.--Houston [14th Dist.] 1976, writ ref'd n.r.e.). A statute that discriminates on
the basis of sex violates the ERA unless the State can prove the classification is somehow required
by the unique physical characteristics of the sexes.(9) Mercer, 538 S.W.2d at 206. If physical
characteristics justify the denial of equality, then the State need demonstrate only a rational basis
for the statute; otherwise, the State must show there is no less restrictive way to protect a
compelling state interest. See McLean, 725 S.W.2d at 798; Mercer, 538 S.W.2d at 206.

 The United States Supreme Court has held that Title XIX does not obligate a state
to pay for medical services for which federal reimbursement is not available, but a state may
choose to include medically necessary abortions in its Medicaid plan. Harris v. McRae, 448 U.S.
at 309, 311 n.16. Although it is permitted to pay for medically necessary abortions exclusively
with state funds, Texas has chosen not to do so. Low-Income Women insist that the State's
adoption of the Hyde Amendment funding restriction denies Medicaid-eligible women equality of
rights by not applying the same standard of medical necessity to men and women.

 The State initially argues that its refusal to pay for medically necessary abortions
does not deny equality under the law. It urges that Texas refuses to fund medically necessary
abortions for all indigent citizens, regardless of gender. If a man were to require an abortion, the
argument goes, the State would refuse to fund the treatment unless his life were in danger. The
fallacy of this argument is plain, for at this time it is biologically impossible for a man to become
pregnant and require an abortion to protect his health. Under the Texas Medical Assistance
Program, the only patient who ever has to demonstrate something more than a medical necessity
to receive treatment is a pregnant woman. Every other treatment affecting reproductive health is
funded for both sexes if determined to be medically necessary. The Hyde Amendment does not
apply equally to men and women.


Pregnancy Discrimination as Sex Discrimination

 The Texas Legislature has plainly stated that in the employment context 
"discrimination because of sex or on the basis of sex includes discrimination because of or on the
basis of pregnancy, childbirth, or a related medical condition." Tex. Lab. Code Ann. § 21.106
(West 1996). The Texas Supreme Court has also indicated that discrimination based on pregnancy
is a form of sex-based discrimination prohibited by section 106.001 of the Civil Practice and
Remedies Code. Board of Trustees of Bastrop Indep. Sch. Dist. v. Toungate, 958 S.W.2d 365,
369 (Tex. 1997).

 Toungate involved a challenge to a school's hair-length and grooming code under
section 106.001, which prohibits discrimination by a public officer or employee because of race,
religion, color, sex, or national origin. See Tex. Civ. Prac. & Rem. Code Ann. § 106.001 (West
Supp. 2000). Examining the legislative history of that statute, the supreme court noted that its
predecessor statute had been amended in 1971 to include sex as a prohibited basis for
discrimination; this amendment was added during the same legislative session in which the
legislature voted to put the ERA on the Texas ballot. Toungate, 958 S.W.2d at 369. The court
went on to note that a further amendment in 1983 illuminated what the legislature meant by
"because of . . . sex." Id. Studying the legislative history, the supreme court found that the
prohibition against sex discrimination in section 106.001 had been derived from the Human Rights
Act, now codified in the Texas Labor Code sections 21.001-.306 (West 1996 & Supp. 2000). Id. 
The Human Rights Act provides that sex discrimination includes discrimination based on
pregnancy. Id.; Tex. Lab. Code Ann. § 21.106. Thus, section 106.001 of the Civil Practice and
Remedies Code shares a common origin with the Human Rights Act, and "because of sex" has the
same meaning in both codes. Toungate, 958 S.W.2d at 369. Further, the court tied the statutory
definition of "because of sex" to the legislature's drafting of the ERA, which contains analogous
language. Id. Accordingly, we hold that the ERA's proclamation that "[e]quality under the law
shall not be denied or abridged because of sex" proscribes discrimination on the basis of
pregnancy.

 We note that our holding is in line with the view of sex discrimination adopted both
by Congress and by a majority of states. In 1978, Congress passed the Pregnancy Discrimination
Act, amending Title VII of the Civil Rights Act of 1964 to prohibit discrimination on the basis of
pregnancy. See Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 670
(1983). Specifically, the Act states "[t]he terms 'because of sex' or 'on the basis of sex' include
. . . because of or on the basis of pregnancy, childbirth, or related medical conditions." 42
U.S.C.A. § 2000e-(k) (West 1994). The United States Supreme Court noted that Congress passed
the Act specifically to overrule that Court's contrary conclusion in General Electric Co. v. Gilbert,
429 U.S. 125 (1976), that the exclusion of pregnancy-related disabilities from an employer's
disability plan did not constitute sex discrimination under Title VII. Newport News, 462 U.S. at
678. Likewise, many state legislatures have enacted similar statutes equating pregnancy
discrimination with sex discrimination, and many state courts have interpreted sex-discrimination
statutes to include discrimination on the basis of pregnancy.(10)

Physical-Characteristics Exception

 Having determined that the state's refusal to pay for medically necessary abortions
discriminates against pregnant women and that pregnancy discrimination is a form of sex
discrimination, we next inquire whether physical characteristics require--and thus excuse--that
sex-based distinction. Unless the proponent of a law can rebut a prima facie ERA case by showing
that unique physical characteristics of the sexes require different treatment under the law, we
employ a "strict scrutiny" standard in reviewing a challenged statute. Messina v. State, 904
S.W.2d 178, 180 (Tex. App.--Dallas 1995, no writ); Mercer, 538 S.W.2d at 206.

 "For us to adjudicate that women are men would be as futile as it would be absurd. 
Neither the ERA nor the rights established by it require us to construe it so as to deny sexual or
reproductive differences between the sexes." Mercer 538 S.W.2d at 206. Nonetheless, it does
not suffice to simply say, as the State essentially does, that because only women can get pregnant,
physical characteristics require the distinction effected by the Hyde Amendment. If that were the
case, discrimination based on pregnancy would never constitute sex discrimination, and we know
from the cases and statutes that that is not the law.

 In 1978, a man accused of rape charged that the criminal statute made it impossible
for a woman to be the perpetrator and that this discrimination based on sex violated the Texas
ERA. Finley v. State, 527 S.W.2d 553, 555 (Tex. Crim. App. 1975). The court of criminal
appeals agreed that the statute's definition of perpetrator excluded women, but held that the
different physical characteristics of the sexes justified the sex-based distinction: "Hymen and
uterine injury to female rape victims, the possibility of pregnancy, and the physiological difficulty
of a woman forcing a man to have sexual intercourse with her all suggest a justification for the
sexual distinction." Id. at 556. In relying on this physical-characteristic exception, the court
specifically looked for a justifiable link between the classification made on the basis of sex and the
legitimate purposes of the statute. The court held that the object of the rape statute was to prevent
assaults that are usually perpetrated by men against women, and so the different physical
characteristics of the sexes justified the sex-based definition of perpetrator in the statute. See id.(11)

 Applying Finley, we hold that in addition to pointing to a particular physical
characteristic that illustrates how the sexes are different, the State must also show that singling out
that characteristic furthers the goals of the statute being challenged. Unless the physical-characteristic exception is narrowly and strictly applied, the exception can wholly swallow the
ERA's prohibition against discrimination based on sex. The State cannot rebut a discrimination
claim simply by showing that the sexes are different; the State must also show that the difference
between the sexes necessitates different treatment to accomplish the purposes of the law. 
Specifically, the State may not defend the discrimination imposed by the Hyde Amendment merely
by stating the obvious proposition that only women get pregnant. There must also be some
explanation of why the physical characteristics of pregnancy justify or require different health care
treatment under the Medicaid law. The State has offered no such explanation.

 The Medical Assistance Program was established to "provide medical assistance on
behalf of needy individuals" and to ensure that "adequate and high quality health care may be made
available to all children and adults who need the care and are not financially able to pay for it." 
Tex. Hum. Res. Code. Ann. §§ 32.001, .002 (West 1990). The effect of the Hyde Amendment
is to deny funding for a type of treatment that a doctor may deem medically necessary. It singles
out one particular medical procedure and denies funding for that treatment even when it is
medically necessary for the patient's health. There is no physical characteristic peculiar to
pregnant women that justifies the denial of medically necessary care that only women patients
require.

 Men and women who meet the general criteria regarding their financial and medical
needs are similarly situated in their eligibility for Medicaid services. Medically necessary
treatment is available to all Medicaid-eligible patients, with one exception: the Hyde Amendment
denies funding for medically necessary abortions. This gender-based restriction operates to the
disadvantage of women who are otherwise eligible for Medicaid services. We hold that Texas's
adoption of the Hyde Amendment singles out for less favorable treatment a gender-linked
condition that is unique to women. There is no comparable restriction on medically necessary
services relating to physical characteristics that are unique to men. This restriction is not related
to the stated purposes of the Texas Medical Assistance Program, which is to offer medical
assistance to all qualified needy citizens. More importantly, the physical characteristic of
becoming pregnant may have profound consequences on the health of the mother; it may aggravate
pre-existing conditions such as heart disease, epilepsy, hypertension, anemia, and may hamper
treatment of other serious medical conditions such as cancer. The Hyde Amendment is a
classification that operates to the disadvantage of many of the persons the Medicaid program was
designed to serve. Because all of the disadvantaged persons are women, we hold that the funding
restriction violates the Texas ERA and is not justified by any physical characteristic related to the
purpose of the program.

 The federal constitution does not require the government to fund a woman's
exercise of her constitutional right to an abortion. Harris v. McRae, 448 U.S. at 317-18. But
when Texas chooses to provide medically necessary services to indigent persons, the ERA
mandates that it not do so in a way that discriminates on account of gender.


Strict Scrutiny

 The ERA elevates sex to a suspect classification, and the supreme court has stated
that when a classification distinguishes between people on a suspect basis, "the state action is
subjected to strict scrutiny, requiring that the classification be narrowly tailored to serve a
compelling government interest." Richards v. League of United Latin Am. Citizens, 868 S.W.2d
306, 311 (Tex. 1993);(12) see also Lawrence v. State, State, No. 14-99-109-CR, slip op. at 7 (Tex.
App.--Houston [14th Dist.] June 8, 2000, no pet.) ("[T]he ERA does not yield except to
compelling state interests.").

 Because the State is unable to show that any unique physical characteristic of the
sexes justifies the discriminatory effect of the funding restriction on women seeking medically
necessary abortions, we subject the challenged statute to review under the strict scrutiny standard. 
See Mercer, 538 S.W.2d at 206. Under that standard, sex-based discrimination is allowed only
if the State can show that it serves a compelling state interest in the least restrictive manner. See
McLean, 725 S.W.2d at 698; Mercer, 538 S.W.2d at 206.

 The State urges that it has a legitimate state interest in protecting both fetal and
maternal health, and that it may permissibly implement a policy that favors childbirth over
abortion to protect those interests. However, the State has not demonstrated how its asserted
interest in maternal health is protected by a funding ban that denies abortions that are medically
necessary to preserve maternal health. As for the State's interest in fetal health, it is well
established that the State's interest in protecting unborn life is tempered by the mother's individual
rights, including the right to protect her own health. See Planned Parenthood v. Casey, 505 U.S.
833, 846 (1992) (plurality opinion); Roe v. Wade, 410 U.S. 113, 164 (1973). The state's interest
in protecting the potential life of the unborn clashes with the woman's fundamental right of
procreative choice. In Roe v. Wade, the U.S. Supreme Court held that prior to fetal viability, the
state may impose regulations on abortion only to protect the health of the mother, not to protect
the unborn fetus. Roe v. Wade, 410 U.S. at 164-65; see also Casey, 505 U.S. at 879. The Roe
v. Wade decision held that the state's interest in protecting the fetus becomes compelling only after
viability; before that time any interest in the unborn fetus must be balanced against concerns for
the mother's health, and the state may not protect the fetus at the expense of the mother's health.
Casey, 505 U.S. at 879; Roe v. Wade, 410 U.S. at 164-65. By denying funding for abortions that
doctors deem medically necessary, the funding restrictions attempt to protect the State's interest
in the fetus at the expense of the mother's health and welfare. This is impermissible under the
framework of Roe v. Wade and Casey. See Casey, 505 U.S. at 879; Roe v. Wade, 410 U.S. at
164-65. The State must tread more carefully when protecting the interests of the unborn; a blanket
ban on funding medically necessary abortions is not narrowly tailored to advance the State's
interest. There are less restrictive means available to encourage childbirth over abortion, such as
continuing to fund prenatal care and childbirth expenses and stepping-up health and education
efforts to prevent unwanted pregnancies. These solutions would further the State's interest in
encouraging birth over abortion without simultaneously discriminating against women who require
an abortion to maintain their health.

 Nor can the sex-based discrimination effected by the Hyde Amendment be justified
as serving a compelling state fiscal policy. Low-Income Women focus on the fiscal nature of the
funding restriction to argue that the only state interest advanced is a funding scheme to limit public
expenditures. The State has not established that the savings resulting from not funding medically
necessary abortions is greater than the costs associated with the medical expenses the Medicaid-eligible woman would incur in bringing the pregnancy to term or dealing with the costs to her own
health in doing so. Low-Income Women point to evidence that carrying a child to term, especially
in a problem pregnancy where the mother's health is at risk, is more costly than an abortion. But
even if the restriction on funding medically necessary abortions exclusively with state funds would
save the State money, the State has pointed to no reason why this fiscal burden must be borne by
pregnant women only. A statute seeking to conserve state resources must be narrowly tailored not
to deny medically necessary treatment on the basis of sex or pregnancy.

 Perhaps most compellingly, there is dissonance between the goal of the Medical
Assistance Program and the effect of the funding restrictions. By delaying or preventing women
from obtaining a medically necessary treatment, the abortion-funding restriction not only fails to
advance the State's interest in providing medical assistance to the needy, it poses an active threat
to some women's health. Texas's implicit adoption of the Hyde Amendment does not narrowly
serve a compelling state interest.(13)


Availability of Remedy

 The State argues that the relief sought by Low-Income Women is barred by a
provision in the Texas Constitution that states: "No money shall be drawn from the Treasury but
in pursuance of specific appropriations made by law." Tex. Const. art. VIII, § 6. Further, the
legislature is barred from granting "by appropriation or otherwise, any amount of money out of
the Treasury of the State, to any individual, on a claim, real or pretended, when the same shall
not have been provided for by pre-existing law." Tex. Const. art. III, § 44 (West 1997). The
State urges that by granting the injunction sought by Low-Income Women, this Court would
impermissibly require the Medical Assistance Program to fund abortions where the legislature has
not appropriated funds for them and where there is no pre-existing law authorizing such
appropriation. We disagree.

 The relief sought by Low-Income Women--funding medically necessary abortions--
cannot be characterized as a new appropriation. They do not ask for a new appropriation of funds
to the Medical Assistance Program. Rather, they seek declaratory and injunctive relief against
unconstitutional restrictions placed on the use of funds already appropriated pursuant to a pre-existing law authorizing funds to be used for health care under the program. Therefore, we find
no constitutional violation in granting the relief requested.


Response to the Dissent

 In response to the dissent, we do not hold that the ERA creates a constitutional
entitlement to funds. Nor do we hold that the ERA makes poverty a suspect classification. Rather
we hold that because the ERA elevates sex to a suspect classification, the state legislature may not
fund medical services in a manner that has a discriminatory effect on women absent some
compelling state interest that is applied in the least restrictive manner. See McLean, 725 S.W.2d
at 698. We find no compelling state interest that justifies denying medically necessary abortions. 
Neither does the dissent.

 Moreover, the dissent recognizes that the legislature's enactment of the Texas
Medical Assistance Program has a disparate impact on women: "Although the impact of these
events is felt almost exclusively by indigent women, the ERA does not change the calculus of
identifying a suspect classification. Poverty is not a suspect classification in Texas." Slip opinion
at p. 7. This might be true if the federal funding restriction disadvantages all indigent Texans
equally; it does not. In the face of the restriction's admitted discrimination against poor women,
the dissent wrongly asserts that the ERA "does not change our calculus of identifying a suspect
classification." What the ERA does is elevate sex to a suspect classification. Id. Whether or not
sex-based discrimination violates federal equal protection and privacy guarantees, it is subject to
strict scrutiny under the Texas ERA. Id.

 There is no entitlement to funds under the ERA; there is no constitutional obligation
to care for the indigent. There is only a mandate to enact programs that do not discriminate
against Texans on the basis of sex. The Texas Medical Assistance Program does not discriminate
against all indigent Texans; its impact is "felt almost exclusively by indigent women," and it does
not survive strict scrutiny analysis.


CONCLUSION

 Because any claim against the presently unfunded Maternal/Infant Health Act
program is not ripe, we vacate that part of the judgment concerning claims against that program
and its administrators and dismiss that portion of the cause. We hold that the Medicaid funding
scheme that denies funding for medically necessary treatment that is not reimbursed by the federal
government effects an impermissible form of sex discrimination against pregnant women. Because
the State has not shown that the statutory scheme is narrowly tailored to serve a compelling state
interest, we hold that the State's implicit adoption of the Hyde Amendment violates the Texas
Equal Rights Amendment. We therefore reverse that portion of the trial court's judgment in favor
of the State; we render judgment granting the declaratory and injunctive relief requested in Low-Income Women's motion for summary judgment. We further remand that portion of the cause
concerning Low-Income Women's request for costs and attorneys' fees to the trial court for
consideration in light of this opinion.



 

 Justice Bea Ann Smith

Before Justices Jones, B. A. Smith and Yeakel

Vacated and Dismissed in Part; Reversed and Rendered in Part;

      Reversed and Remanded in Part

Filed: December 7, 2000

Publish


1. Low-Income Women are represented in this lawsuit by Robert Prince, M.D.; Curtis
Boyd, M.D.; William Watkins West, Jr., M.D.; The Fairmount Center; The Routh Street
Women's Clinic; and Reproductive Health Services.
2. By a Rule 11 agreement submitted to the district court prior to trial, Low-Income
Women agreed to drop all claims against defendants Eric M. Bost, the Texas Board of Human
Services, and the Texas Department of Human Services, "as these defendants do not administer
the challenged programs and have no impact upon the issues presented in this case." See Tex. R.
Civ. P. 11. The remaining defendants/appellees are current Commissioner of Health Charles E.
Bell, the Texas Board of Health, and the Texas Department of Health. We will refer to defendants
collectively as "the State."
3. The original version of the Hyde Amendment read: "None of the funds contained in this
Act shall be used to perform abortions except where the life of the mother would be endangered
if the fetus were carried to term." Departments of Labor and Health, Education, and Welfare
Appropriation Act, Pub. L. No. 94-439, sec. 209, 90 Stat. 1418 (1976).
4. The Hyde Amendment enacted with the 1999 budget reads:


SEC. 508. (a) none of the funds appropriated under this Act, and none of the
funds in any trust fund to which funds are appropriated under this Act, shall
be expended for any abortion.


. . . .


SEC. 509. (a) The limitations established in the preceding section shall not
apply to an abortion-- 


(1) if the pregnancy is the result of an act of rape or incest; or


(2) in the case where a woman suffers from a physical disorder, physical
injury, or physical illness, including a life-endangering physical
condition caused by or arising from the pregnancy itself, that would, as
certified by a physician, place the woman in danger of death unless an
abortion is performed.


Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub. L. No.
105-277, sec. 508(a), 509(a), 112 Stat. 2681-385 (1998).
5. The State's responses to plaintiffs' requests for admission included the following:


No. 15: List any non-experimental reproductive health care services for
eligible men that are only covered by the Medical Assistance Program when
their lives are endangered.


ANSWER: None


No. 16: List any non-experimental health services, other than abortions, that
are provided only when the eligible person's life is endangered.


ANSWER: Limited adult dental services.
6. These types of abortions are those exempted from the Hyde Amendment's proscription
on federal funding for abortion and are thus covered by Medicaid and the Medical Assistance
Program.
7. 410 U.S. 114 (1973).
8. See Committee to Defend Reprod. Rights v. Myers, 625 P.2d 779, 798 (Cal. 1981)
(funding restrictions offended express right to procreative choice in California constitution); Doe
v. Maher, 515 A.2d 134, 135 (Conn. Super. Ct. 1986) (funding restrictions on therapeutic
abortions violate statutory provisions of Medicaid program, as well as Connecticut constitutional
rights of due process and equal protection); Moe v. Secretary of Admin. & Fin., 417 N.E.2d 387,
402 (Mass. 1981) (Medicaid funding restriction impermissibly burdens right to choose abortion
protected by Massachusetts constitutional guarantee of due process); Women of Minn. v. Gomez,
542 N.W.2d 17, 31 (Minn. 1995) (funding restrictions impermissibly infringe upon woman's right
to privacy protected by Minnesota constitution); Right to Choose v. Byrne, 450 A.2d 925, 941
(N.J. 1982) (statute limiting Medicaid funding for abortions violates equal protection right found
in New Jersey constitution); New Mex. Right to Choose/NARAL v. Johnson, 975 P.2d 841, 844-45
(N.M. 1998) (funding restrictions violate state Equal Rights Amendment); Women's Health Ctr.
v. Panepinto, 446 S.E.2d 658, 667 (W. Va. 1993) (because state must act neutrally when
providing medical care for poor, funding restrictions that favor childbirth over abortion infringe
on state constitutional rights). But see Doe v. Department of Soc. Servs., 487 N.W.2d 166, 168
(Mich. 1992) (prohibition on use of public funds to pay for abortion unless necessary to save
mother's life does not violate equal protection guarantees of state constitution); Hope v. Perales,
634 N.E.2d 183, 187-88 (N.Y. 1994) (funding pregnancy-related services but not medically
necessary abortions does not violate due process clause of state constitution); Rosie J. v. North
Carolina Dep't of Human Res., 491 S.E.2d 535, 537-38 (N.C. 1997) (funding scheme that favors
childbirth over abortion does not offend North Carolina constitution); Fischer v. Department of
Pub. Welfare, 502 A.2d 114, 117-18 (Pa. 1985) (funding restrictions do not violate equal
protection and non-discrimination guarantees or Equal Rights Amendment of Pennsylvania
constitution).
9. Acknowledging that the ERA does permit some limited exceptions to the prohibition on
sex discrimination, in addition to the physical-characteristics exception, the Mercer court also
recognized a defense for sex-based discrimination that is required by other constitutionally
protected rights or "other compelling reasons." Mercer v. Board of Trustees, 538 S.W.2d 201,
206 (Tex. Civ. App.--Houston [14th Dist.] 1976, writ ref'd n.r.e.)


 Recently, the fourteenth court of appeals in Houston held section 21.06 of the penal
code, which makes homosexual sodomy a crime, unconstitutional because it violates the ERA. 
Lawrence v. State, No. 14-99-109-CR, slip op. at 8 (Tex. App.-- Houston [14th Dist.] June 8,
2000, no pet.). In so holding, that court held that the state had not shown "other compelling
reasons to justify the sex-based discrimination wrought by the statute." Id. slip op. at 7. The
court did not reach the other Mercer exceptions because their applicability was not raised by the
state. Id. slip op at 5 n.3.
10. See, e.g., Alaska Stat. § 18.80.200 (Lexis 1998) (includes sex, pregnancy, and
parenthood on list of prohibited bases for discrimination); Cal. Gov't Code § 12926(o) (West
Supp. 1999) ("sex" as defined in discrimination statute includes pregnancy, childbirth, or medical
conditions related to pregnancy or childbirth); Me. Rev. Stat. Ann. tit. 5, § 4572-A (West 1989)
(sex discrimination includes pregnancy and related medical conditions); N.H. Rev. Stat. Ann.
§ 354A:7 (1995) (employment discrimination statute includes pregnancy in definition of sex
discrimination); Colorado Civil Rights Comm'n v. Travelers Ins. Co., 759 P.2d 1358, 1365 (Cal.
1988) (employer violated state ERA and discrimination statute by excluding costs of pregnancy-related medical treatment from benefits plan covering other normal conditions); Allison-LeBlanc
v. Department of Pub. Safety & Corrections, 671 So.2d 448, 452 (La. Ct. App. 1995)
(discrimination based on pregnancy is unconstitutional sex discrimination); Massachusetts Elec.
Co. v. Massachusetts Comm'n Against Discrim., 375 N.E.2d 1192, 1199 (Mass. 1978)
(discrimination based on pregnancy is sex discrimination).
11. A few years later the court reversed itself by holding that the statutory definition of
"sexual intercourse" in the rape statute does not limit the sex of the perpetrator. See Ex parte
Groves, 571 S.W.2d 888, 892 (Tex. Crim. App. 1978). This in no way invalidated the
methodology suggested in Finley for determining when a physical characteristic will save an
otherwise discriminatory statute. To the extent that other courts have failed to apply the Finley
methodology, we decline to follow them. See, e.g., MJR's Fare of Dallas, Inc. v. City of Dallas,
792 S.W.2d 569, 575 (Tex. App.--Dallas 1990, writ denied).
12. Richards involved an equal protection challenge. Richards v. League of United Latin
Am. Citizens, 868 S.W.2d 306 (Tex. 1993). Because the supreme court has also acknowledged
that the ERA elevates sex to a suspect classification, McLean, 725 S.W.2d at 698, we apply the
same strict scrutiny analysis here.
13. For these same reasons, we doubt that the funding restrictions on abortion could survive
scrutiny even under a rational-basis test. The statutory provisions being challenged are silent as
to abortion. In fact, correlative provisions have been in place since the Medical Assistance
Program was established in 1967, some nine years before the enactment of the Hyde Amendment. 
It is therefore difficult for the State to point to abortion policy as the rationale behind the statutory
provisions that limit the benefits available under the program.


nfringe
on state constitutional rights). But see Doe v. Department of Soc. Servs., 487 N.W.2d 166, 168
(Mich. 1992) (prohibition on use of public funds to pay for abortion unless necessary to save
mother's life does not violate equal protection guarantees of state constitution); Hope v. Perales,
634 N.E.2d 183, 187-88 (N.Y. 1994) (funding pregnancy-related services but not medically
necessary abortions does not violate due process clause of state constitution); Rosie J. v. North
Carolina Dep't of Human Res., 491 S.E.2d 535, 537-38 (N.C. 1997) (funding scheme that favors
childbirth over abortion does not offend North Carolina constitution); Fischer v. Department of
Pub. Welfare, 502 A.2d 114, 117-18 (Pa. 1985) (funding restrictions do not violate equal
protection and non-discrimination guarantees or Equal Rights Amendment of Pennsylvania
constitution).
9. Acknowledging that the ERA does permit some limited exceptions to the prohibition on
sex discrimination, in addition to the physical-characteristics exception, the Mercer court also
recognized a defense for sex-based discrimination that is required by other constitutionally
protected rights or "other compelling reasons." Mercer v. Board of Trustees, 538 S.W.2d 201,
206 (Tex. Civ. App.--Houston [14th Dist.] 1976, writ ref'd n.r.e.)


 Recently, the fourteenth court of appeals in Houston held section 21.06 of the penal
code, which makes homosexual sodomy a crime, unconstitutional because it violates the ERA. 
Lawrence v. State, No. 14-99-109-CR, slip op. at 8 (Tex. App.-- Houston [14th Dist.] June 8,
2000, no pet.). In so holding, that court held that the state had not shown "other compelling
reasons to justify the sex-based discrimination wrought by the statute." Id. slip op. at 7. The
court did not reach the other Mercer exceptions because their applicability was not raised by the
state. Id. slip op at 5 n.3.
10. See, e.g., Alaska Stat. § 18.80.200 (Lexis 1998) (includes sex, pregnancy, and
parenthood on list of prohibited bases for discrimination); Cal. Gov't Code § 12926(o) (West
Supp. 1999) ("sex" as defined in discrimination statute includes pregnancy, childbirth, or medical
conditions related to pregnancy or childbirth); Me. Rev. Stat. Ann. tit. 5, § 4572-A (West 1989)
(sex discrimination includes pregnancy and related medical conditions); N.H. Rev. Stat. Ann.
§ 354A:7 (1995) (employment discrimination statute includes pregnancy in definition of sex
discrimination); Colorado Civil Rights Comm'n v. Travelers Ins. Co., 759 P.2d 1358, 1365 (Cal.
1988) (employer violated state ERA and discrimination statute by excluding costs of pregnancy-related medical treatment from benefits plan covering other normal conditions); Allison-LeBlanc
v. Department of Pub. Safety & Corrections, 671 So.2d 448, 452 (La. Ct. App. 1995)
(discrimination based on pregnancy is unconstitutional sex discrimination); Massachusetts Elec.
Co. v. Massachusetts Comm'n Against Discrim., 375 N.E.2d 1192, 1199 (Mass. 1978)
(discrimination based on pregnancy is sex discrimination).
11. A few years later the court reversed itself by holding that the statutory definition of
"sexual intercourse" in the rape statute does not limit the sex of the perpetrator. See Ex parte
Groves, 571 S.W.2d 888, 892 (Tex. Crim. App. 1978). This in no way invalidated the
methodology suggested in Finley for determining when a physical characteristic will save an
otherwise discriminatory statute. To the extent that other courts have failed to apply the Finley
methodology, we decline to follow them. See, e.g., MJR's Fare of Dallas, Inc. v. City of Dallas,
792 S.W.2d 569, 575 (Tex. App.--Dallas 1990, writ denied).
12. Richards involved an equal protection challenge. Richards v. League of United Latin
Am. Citizens, 868 S.W.2d 306 (Tex. 1993). Because the supreme court has also acknowledged
that the ERA elevates sex to a suspect classification, McLean, 725 S.W.2d at 698, we apply the
same strict scrutiny analysis here.
13. For these same reasons, we doubt that the funding restrictions on abortion could survive
scrutiny even under a rational-basis test. The statutory provisions being challenged are silent as
to abortion. In fact, correlative provisions have been in place since the Medical Assistance
Program was established in 1967, some